Suzanne BYNUM, Plaintiff–Appellee,

v.

CIGNA HEALTHCARE OF NORTH CAROLINA, INCORPORATED, Defendant–Appellant.

No. 01–1705.

United States Court of Appeals, Fourth Circuit.

Argued Jan. 22, 2002.

Decided April 19, 2002.

**ARGUED:** Mark Stanton Thomas, Maupin, Taylor & Ellis, P.A., Raleigh, North Carolina, for Appellant. Robert Edward Hoskins, Foster & Foster, L.L.P., Greenville, South Carolina, for Plaintiff–Appellee. **ON BRIEF:** Joanne J. Lambert, Maupin, Taylor & Ellis, P.A., Raleigh, North Carolina, for Defendant–Appellant.

Before WILLIAMS and KING, Circuit Judges, and CYNTHIA HOLCOMB HALL, Senior Circuit Judge of the United States Court of Appeals for the Ninth Circuit, sitting by designation.

Affirmed by published opinion. Judge KING wrote the opinion, in which Judge WILLIAMS and Senior Judge CYNTHIA HOLCOMB HALL concurred.

## OPINION

KING, Circuit Judge.

Suzanne Bynum initiated this ERISA civil action in the District of South Carolina against CIGNA Healthcare of North Carolina, Incorporated ("CIGNA"), maintaining that CIGNA had improperly denied her infant daughter's claim for health benefits for treatment of a skull deformity. The district court reversed CIGNA's decision and awarded the benefits sought by Ms. Bynum's daughter. CIGNA has appealed the court's ruling, maintaining that its denial of benefits was appropriate. As explained below, we agree that Ms. Bynum's infant daughter, Katrina, was entitled to coverage from CIGNA for treatment of her misshapen head, and we affirm.

### I.

#### A.

Katrina Bynum, along with her twin sister, was born to Ms. Bynum in late 1999 by spontaneous vaginal delivery after a thirty-nine week gestation period. At her birth, Katrina exhibited symptoms of congenital torticollis, i.e., a severely twisted neck,[1] which subsequently resulted in plagiocephaly, i.e., an abnormally asymmetrical head.[2] In May 2000, concerned about her nine-month old daughter's medical condition and desiring to obtain treatment for it, Ms. Bynum sought medical care for Katrina from a pediatrician in Matthews, North Carolina. This pediatrician, Dr. Michelle Parish, referred Katrina to a specialist in neurosurgery, and, at the direction of Dr. C. Scott McLanahan, a pediatric neurosurgeon practicing in Charlotte, North Carolina, Katrina's condition was treated with a medical procedure known as "cranial banding" or "dynamic

---

1. Congenital torticollis is a birth defect involving a severely twisted neck and is typically "due to injury to the sternocleidomastoid muscle on one side at the time of birth and its transformation into a fibrous cord which cannot lengthen with the growing neck." *Dorland's Illustrated Medical Dictionary* 1723 (28th ed.1994).

2. Plagiocephaly has been medically defined as "an unsymmetrical and twisted condition of the head, resulting from irregular closure of the cranial sutures." *Dorland's Illustrated Medical Dictionary* 1299.

orthotic cranioplasty" (the "DOC Procedure").

The DOC Procedure, which costs approximately $3,000, involved creating a custom-molded orthotic device to be worn by Katrina in order to progressively mold and correct the shape of her cranium.[3] The purpose of the DOC Procedure, as described by Dr. McLanahan, was to treat immediately the functional significance of Katrina's asymmetrical skull because "head shape abnormalities or asymmetry of the skull base can lead to further deformities or physical impairments of the facial region, such as malocclusion of the mandible."[4]

### B.

In May 2000, Dr. McLanahan submitted to CIGNA a coverage request for the DOC Procedure utilized to treat Katrina's condition ("Katrina's Claim"). Katrina was an insured of CIGNA through insurance coverage provided to her mother, an employee of an entity called Pathways for Learning in Charlotte, North Carolina. Ms. Bynum possessed health insurance through her employer-sponsored health plan, and her family's coverage is governed by the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1001 et seq. CIGNA serves the plan in two capacities: first, as its insurer, and second, as its plan administrator. The member certificate (the "Plan") provided to each of the Plan's insureds describes the insurance coverage and benefits provided by CIGNA, and it also spells out the administrative procedures under which the Plan operates. The Plan has established a two-level administrative appeal and grievance process for the resolution of claims and benefits questions, and it has granted CIGNA the "final power and discretionary authority to interpret and administer th[e] Member Certificate, including the authority to make eligibility determinations."

Katrina's Claim was filed with CIGNA on May 16, 2000, and the next day one of CIGNA's Medical Directors wrote Ms. Bynum a denial letter, advising, after "careful review," that CIGNA had "determined that coverage is not available . . . because cosmetic services are not covered." CIGNA's denial letter offered no explanation of what constituted a cosmetic service, and the Plan contains no definition for either the terms "cosmetic" or "cosmetic services."

Thereafter, pursuant to the procedures established in the Plan, Dr. McLanahan filed with CIGNA, on behalf of Ms. Bynum and Katrina, what the Plan denominates as a first-level appeal. In this first-level appeal, CIGNA was requested to review and reconsider its earlier decision to deny Katrina's Claim for the DOC Procedure.[5] By

---

**3.** The administrative record does not reflect the specific treatment protocol prescribed for Katrina. Generally, a DOC Procedure involves wearing the custom-molded orthotic device twenty-three hours per day, with the infant's progress being followed weekly so that any necessary modifications can be made to the orthotic device. The average treatment time is four months. *Dynamic Orthotic Cranioplasty, at* http://www.cranialtherapies.com (last visited March 19, 2002).

**4.** Malocclusion of the mandible is a serious condition affecting the teeth, jaw, and facial structure. It involves the malposition of teeth, which results in pain, degeneration, and jaw clicking. If left untreated, malocclusion of the mandible can also affect a person's ability to eat, speak, and maintain good oral hygiene. *See Dorland's Illustrated Medical Dictionary* 982; World Craniofacial Foundation, *Deformities of the Jaw, at* http://www.worldcf.org/jaw.html (last visited March 19, 2002).

**5.** The Plan specifies that CIGNA's Member Services Department will investigate first-level appeals, and that if the matter is "clinical" at least one reviewer will be a medical doctor.

letter of May 26, 2000, Dr. McLanahan explained to CIGNA that children suffering from nonsynostoic cranial asymmetries (such as that affecting Katrina) benefit from DOC treatment. He also sought to directly address the "cosmetic services" issue raised in the denial letter, and he further advised CIGNA that "[c]orrection of [Katrina's] defect may in fact lead to a more pleasant appearance, however, *it is the functional significan[ce] of the defect that compels the treatment.*" (emphasis added). In so concluding, he advised CIGNA, referring to the DOC Procedure, that "*[i]t is clearly not treatment of a cosmetic deformity.*" (emphasis added).

CIGNA responded to Katrina's first-level appeal by advising Ms. Bynum that it was denying coverage for Katrina's Claim. In explaining its decision, CIGNA again maintained that use of the DOC Procedure for nonsynostoic plagiocephaly is a "cosmetic procedure," and it also asserted that "[t]he documentation fails to substantiate the medical necessity for the [DOC] service." As in its initial denial of Katrina's Claim, CIGNA offered no definition of what constituted a "cosmetic procedure" under the Plan.

Thereafter, Ms. Bynum retained counsel on Katrina's behalf, and, on July 25, 2000, she filed a second-level appeal with CIGNA. CIGNA then requested production of additional materials or statements that Ms. Bynum deemed relevant to Katrina's Claim, and it advised Ms. Bynum that her second-level appeal would be heard and considered by CIGNA's Grievance Committee (the "Committee" or "CIGNA's Committee").[6]

On August 30, 2000, Ms. Bynum provided CIGNA's Committee with additional materials in support of Katrina's Claim. First, she submitted an affidavit from Dr. McLanahan in which he reiterated that Katrina "suffers from a head shape abnormality related to intrauterine molding and postnatal position" and that, in the opinion of a number of plastic surgeons, "head shape abnormalities or asymmetry of the skull base can lead to further deformities or physical impairments of the facial region, such as malocclusion of the mandible." Dr. McLanahan explained that the "true intent" of Katrina's DOC Procedure was to "eliminate physical defects that might be associated with head shape abnormalities such as 'malocclusion of the mandible,'" and he concluded that "to a reasonable degree of medical certainty, ... the DOC band, as used upon Katrina Bynum, was medically indicated and was not cosmetic under the terms of the [P]lan."[7]

Second, Ms. Bynum provided CIGNA's Committee with a letter of May 25, 2000, from Katrina's treating pediatrician, Dr. Parish. Dr. Parish explained that Katrina suffered from congenital torticollis that had been present at birth. Dr. Parish also advised CIGNA that she had referred Katrina to a neurosurgeon who noted that Katrina had "flattening of the right side of

---

**6.** Three non-CIGNA employees, that is, Dr. James Lindermann, a Board–Certified pediatrician, plus two employer plan benefit administrators, comprised the Committee which heard Ms. Bynum's second-level appeal. The Plan, in its section 13.3, provides for a second-level appeal to be heard by such a Grievance Committee.

**7.** In being "medically indicated," the DOC Procedure, as used upon Katrina's misshapen head, was suggested by probable necessity. *See On–Line Medical Dictionary, at* htpp://cancerweb.ncl.ac.uk (last visited March 19, 2002) (defining "indicate" as "demonstrat[ing] or suggest[ing] the probable necessity or advisability"); *see also Dorland's Illustrated Medical Dictionary* 835 (defining "indicate" as "a sign or circumstance which points to or shows the cause, pathology, treatment or issue of an attack of disease").

her head, right anterior ear shift, frontal bossing right greater than left, [and] plagiocephaly." In conclusion, Dr. Parish related "I believe [Katrina's] plagiocephaly is directly related to her congenital torticollis . . . [and] therefore is a medical condition not a cosmetic condition." [8]

Third, Ms. Bynum submitted to CIGNA's Committee a medical article discussing the treatment of craniofacial asymmetry with the DOC Procedure. Fourth, she provided CIGNA's Committee with a copy of Resolution 119 of the American Medical Association House of Delegates, which defines reconstructive surgery. Pursuant to the AMA Resolution, reconstructive surgery is surgery that is "performed on abnormal structures of the body, caused by congenital defects, developmental abnormalities, . . . or disease. It is generally performed to improve function, but may also be done to approximate a normal appearance." Finally, Ms. Bynum provided the Committee with an American Orthotic and Prosthetic Association Newsletter showing that the DOC Procedure had gained FDA approval as an "approved orthoses" for Katrina's condition.[9]

On August 30, 2000, the Committee convened to consider Katrina's Claim. CIGNA representatives were present at the Committee's meeting, but Ms. Bynum and her attorney, though invited, did not attend.[10] CIGNA's Committee then reviewed Katrina's Claim, the information submitted to it by Ms. Bynum, and a so-called TEC Assessment Report concerning the DOC Procedure submitted to it by CIGNA.[11] By letter to Ms. Bynum of the following day, CIGNA advised that its Committee had "decided to uphold the original decision to deny the Cranial Banding Device." This denial letter explained that the Committee's decision was based on the "Section 5.0 (letter M) Exclusion, [wherein] All Cosmetic procedures or surgery are considered non-covered. The documentation received fails to substantiate the medical necessity for the service." [12] This letter, like the earlier ones, made no effort to explain what CIGNA believed to constitute "cosmetic" procedures or surgery.

### C.

After exhausting her appeal rights under the Plan, Ms. Bynum, on September

---

**8.** The terminology "right anterior ear shift" refers to the right ear being positioned closer to the face than the left ear, and "frontal bossing right greater than left" means that the right side of the head protrudes outward more than the left side.

**9.** An "approved orthoses" is a medical device that the FDA has approved for use in the treatment of specified conditions.

**10.** The administrative record does not indicate why Ms. Bynum or her lawyer did not attend the Committee meeting.

**11.** In general, TEC Assessment Reports are communications disseminated by the BlueCross BlueShield Association which advise regional Blue Cross and Blue Shield insurers whether a treatment meets the coverage criteria (called the TEC criteria) established in Blue Cross and Blue Shield insurance polices. In this case, the TEC Assessment Report in-

volved the DOC Procedure, and it concluded that the procedure failed to meet the Blue Cross and Blue Shield TEC criteria. Thus, because CIGNA's coverage criteria are similar to such TEC criteria, CIGNA likely provided the Committee with the TEC Assessment Report in support of its contention that the DOC Procedure did not conform to CIGNA's coverage criteria.

**12.** CIGNA's reference to the Section 5.0 (letter M) Exclusion is in error; this particular exclusion refers to "[d]iagnosis or treatment of infertility." In fairness to CIGNA, it likely intended to reference the Section 5.0 (letter L) Exclusion, which refers to "all cosmetic procedures or surgery." As such, we will treat the denial of Katrina's Claim by CIGNA's Committee as being premised on the Section 5.0 (letter L) Exclusion.

22, 2000, filed suit against CIGNA pursuant to 29 U.S.C. § 1132(a).[13] She alleged, inter alia, that the Plan provided coverage for the DOC Procedure, and she sought to have the court direct CIGNA to provide coverage for Katrina's Claim.

On April 12, 2001, with cross motions for summary judgment pending, the parties appeared before the district court. For whatever reasons, both parties then requested the court to dispense with the summary judgment proceedings and to try the case on its merits. With the consent of the parties, the court then proceeded to handle the case as a bench trial.[14] On May 9, 2001, the court ruled on the merits of the case, and it determined that the Plan provided coverage for Katrina's Claim. *Bynum v. CIGNA Healthcare of North Carolina, Inc.*, Order, C/A No.: 6:00–3009–13 at 14–16 (D.S.C. May 11, 2001) (the "Opinion"). The court then ordered CIGNA to provide coverage to Katrina for the benefits sought. *Id.* at 15–16.

On May 16, 2001, CIGNA filed a timely notice of appeal. We possess jurisdiction pursuant to 28 U.S.C. § 1291.

## II.

### A.

■ Before turning to the merits of CIGNA's appeal, we must first address and determine the applicable standards of our review of the issues raised here. Generally, decisions made by administrators of ERISA plans are subject to de novo review by the courts. *Firestone Tire &*

*Rubber Co. v. Bruch,* 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989); *see also Bedrick v. Travelers Ins. Co.,* 93 F.3d 149, 152 (4th Cir.1996). When, however, an ERISA plan provides the plan administrator with discretionary authority to interpret the terms of the plan and to make coverage determinations, the administrator's decisions are reviewed by the courts only for abuse of discretion. *Firestone,* 489 U.S. at 115, 109 S.Ct. 948; *Bedrick,* 93 F.3d at 152. Even if a plan administrator possesses such discretion, if it also operates under a conflict of interest, we have recognized the propriety of reviewing courts "not act[ing] as deferentially as would otherwise be appropriate." *Bedrick,* 93 F.3d at 152. Indeed, the greater the "incentive for the [plan] administrator . . . to benefit itself by a certain interpretation of benefit eligibility or other plan terms, the more objectively reasonable the administrator['s] . . . decision must be and the more substantial the evidence must be to support it." *Ellis v. Metro. Life Ins. Co.,* 126 F.3d 228, 234 (4th Cir.1997).

■ These standards of review apply to a district court's review of a plan administrator's coverage determinations in an ERISA case, and they also are applicable on appellate review. In our review of the result of a bench trial, where the district court has made findings and reviewed coverage determinations under the proper standard of review, we do not sit in the same posture as that court. Our review is affected by the principle that when we review a district court's decision on the merits, *see* Fed.R.Civ.P. 52(a), we are, ab-

---

**13.** Section 1132 of Title 29 of the United States Code provides, in relevant part, that "[a] civil action may be brought . . . by a participant or beneficiary . . . to recover benefits due to him under the terms of his plan."

**14.** While the parties' agreement to waive the summary judgment standards and submit their case to the district court on its merits

seems to be unique, the ERISA statute does not preclude such an agreement. *See Tester v. Reliance Standard Life Ins. Co.,* 228 F.3d 372, 374, 377 (4th Cir.2000) (affirming decision of district court after bench trial to award benefits to insured under ERISA plan because plan's term was vague and ambiguous).

sent clear error, bound by its factual findings. *See id.* (requiring that findings of fact made after a bench trial "shall not be set aside unless clearly erroneous"); *Sedlack v. Braswell Servs. Group, Inc.*, 134 F.3d 219, 223 (4th Cir.1998); *Hendricks v. Cent. Reserve Life Ins. Co.*, 39 F.3d 507, 512–13 (4th Cir.1994). In this case, however, we are unable to ascertain whether the district court actually applied the abuse of discretion standard of review when reciting its findings. As a result, we conduct our appellate review of the objective reasonableness of CIGNA's denial of Katrina's Claim without relying on the district court's findings.

### B.

The Plan provides CIGNA, as the Plan Administrator, with "final and discretionary authority to interpret and administer th[e] Member Certificate, including the authority to make eligibility determinations." Accordingly, we may not disturb a coverage determination made by CIGNA in its capacity as the Plan Administrator, so long as its decision is reasonable. If, however, a coverage decision is unreasonable, then CIGNA has abused its discretion, and such an abuse warrants reversal of an affected coverage determination. *See Booth v. Wal–Mart Stores, Inc. Assocs. Health & Welfare Plan*, 201 F.3d 335, 342 (4th Cir. 2000); *see also Feder v. Paul Revere Life Ins. Co.*, 228 F.3d 518, 522 (4th Cir.2000).

■ In this case, CIGNA performed its duties as Plan Administrator under a plain conflict of interest; that is, CIGNA administered the Plan and at the same time insured it. As such, while the abuse of discretion standard remains applicable to CIGNA's coverage determination, we must, because of its conflict of interest, "lessen the deference normally given under this standard of review ... to the extent necessary to counteract any influence unduly resulting from the conflict." *Ellis*, 126 F.3d at 233; *see also Bailey v. Blue Cross & Blue Shield of Va.*, 67 F.3d 53, 56 (4th Cir.1995) (reducing deference "to the degree necessary to neutralize any untoward influence resulting from the conflict" of interest).

CIGNA's conflict of interest in its handling of Katrina's Claim was a substantial one, i.e., CIGNA possessed a significant incentive, in the nature of its financial self-interest, to deny coverage for Katrina's Claim. First of all, CIGNA was interpreting a disputed plan term—the term "cosmetic"—with wide applicability. Because cosmetic procedures are excluded from the Plan's coverage under Section 5.0 (letter L), CIGNA possessed a financial self-interest in defining "cosmetic" in a broad manner. Moreover, as CIGNA's counsel acknowledged at oral argument, CIGNA is presently facing an increasing number of benefit claims for DOC Procedures, because the number of infants with asymmetrical skulls is increasing due to current trends in post-natal positioning.[15] Thus, a decision by CIGNA, as Plan Administrator, to provide coverage for Katrina's Claim would have established a precedent adverse to the long-term financial interests of CIGNA, as insurer. Because CIGNA's conflict of interest on this issue is a significant one, we are obliged to reduce the level of deference normally accorded its coverage determinations, and we must ascertain whether its decision to deny Katrina's Claim was objectively reasonable. Therefore, while we will accord CIGNA's

---

**15.** Some parents apparently are advised to place infants on their backs to prevent the occurrence of sudden infant death syndrome. *See* SIDS Alliance, *Positional Plagiocephaly,* or *"flat heads",* at http://www.sidsalliance.org (last visited March 19, 2002). Katrina's skull deformity, however, is related to her birth defect. *See infra* at 315.

coverage determination some deference, its decision must be examined closely to ensure that it is "supported by substantial evidence," and that it resulted from "a deliberate, principled reasoning process." *Brogan v. Holland*, 105 F.3d 158, 161 (4th Cir.1997) (internal citations and quotations omitted) (explaining criteria for objectively reasonable).

### III.

On appeal, CIGNA maintains that the district court erred by substituting its judgment for CIGNA's reasoned decision, as Plan Administrator, to deny Katrina's Claim. CIGNA makes two contentions in this regard: first, it asserts that the court improperly defined the applicable terms of the Plan; and second, it maintains that the court misapplied the terms of the Plan. We examine each of these points in turn.

### A.

A significant question in this case concerns the proper meaning to be accorded the word "cosmetic," as it is utilized in the Plan. CIGNA contends that the court erred in its definition and application of the term. Specifically, although the parties agree that the Plan does not define "cosmetic," CIGNA maintains that the court erred by not adopting CIGNA's proposed definition of "cosmetic," and by instead "find[ing] that the treatment rendered to … [Katrina] could not be considered 'cosmetic' under any reasonable definition of the word." Opinion at 15.

### 1.

▆ CIGNA first maintains that the court erred by failing to give proper deference to its proposed definition of "cosmetic." While CIGNA is correct that, as Plan Administrator, its definition must be accepted by a court absent an abuse of discretion, *Sheppard & Enoch Pratt Hosp.,*

*Inc. v. Travelers Ins. Co.*, 32 F.3d 120, 123–24 (4th Cir.1994), CIGNA nonetheless abused its discretion by failing to define this crucial term prior to its denial of Katrina's Claim.

Throughout its administrative handling of Katrina's Claim, CIGNA failed to define the relevant terms "cosmetic," "cosmetic services," or "cosmetic procedures." Instead, it simply advised Ms. Bynum that Katrina's Claim had been denied because the DOC Procedure was of a "cosmetic nature." In addition, the record before CIGNA's Committee lacked any reference to CIGNA's definition of "cosmetic," and CIGNA failed to document why the DOC Procedure, as applied to Katrina's skull deformity, constituted an excluded cosmetic procedure. Because there is no evidence that CIGNA sought to define "cosmetic" before being sued by Ms. Bynum, or that CIGNA applied a reasonable definition of the term to Katrina's Claim, the court did not err in declining to defer to CIGNA's after-the-fact definition of "cosmetic." *See id.* at 125 (assessing reasonableness of plan administrator's decision based only on facts known at time of decision).

### 2.

▆ Next, CIGNA maintains that the court erred in concluding that "cosmetic" is an ambiguous term, and that it also erred by not affording the term its ordinary meaning. When interpreting an ERISA health insurance plan, we utilize and apply ordinary principles of contract law, and we "enforc[e] the plan's plain language in its ordinary sense." *Wheeler v. Dynamic Eng'g, Inc.*, 62 F.3d 634, 638 (4th Cir.1995) (internal citations omitted). When, however, a term used in a plan is ambiguous, that ambiguity is construed against the drafter of the plan, and it is construed in accordance with the reason-

able expectations of the insured. *Id.* (citing *Saltarelli v. Bob Baker Group Med. Trust,* 35 F.3d 382, 386 (9th Cir.1994)).

■ We agree with the district court that the term "cosmetic," as used in the Plan, is ambiguous. The Plan makes no effort to define the term, even though multiple definitions exist, both in common usage and in the medical context. From our review, the various definitions of "cosmetic" are generally placed into two categories. First, certain definitions of "cosmetic" limit the term's application to procedures, products, or services that affect appearance only, or which are performed for a purely superficial benefit. *See, e.g., Dorland's Illustrated Medical Dictionary* 385; *Oxford English Dictionary Online, at* http.//www.OED.org (last visited March 19, 2002). Second, other definitions of "cosmetic" apply the term more broadly, and such definitions utilize it to include procedures, products, or services intended to correct physical defects, usually by surgical means. *Dorland's Illustrated Medical Dictionary* 385.

In these circumstances, both categories of definitions of "cosmetic" are reasonable, and each could be utilized in a manner consistent with the term's ordinary meaning. Thus, applying the doctrine of *contra proferentum,* we must construe any ambiguity in a term's ordinary meaning against CIGNA, and in accordance with the insured's expectations, i.e., those of Ms. Bynum and Katrina. *See, e.g., Tester v. Reliance Standard Life Ins. Co.,* 228 F.3d 372, 375 (4th Cir.2000) (applying doctrine of *contra proferentum* in ERISA context); *Bailey v. Blue Cross & Blue Shield of Va.,* 67 F.3d 53, 57 (4th Cir.1995) (same). In so doing, we must utilize the more narrow of the definitions of "cosmetic," limiting the term to those procedures, products, or services that affect appearance only, or which are performed for a purely superficial benefit. Because the definition of "cosmetic" used by the district court comports with the definition we apply, CIGNA's assignment of error in this regard lacks merit.

### B.

Having resolved the ambiguity issue relating to the term "cosmetic," we turn to CIGNA's two specific bases for denying Katrina's Claim for treatment of her misshapen skull. First, CIGNA maintains that Katrina's DOC Procedure was a cosmetic one, and that it was therefore excluded from coverage under the Plan. Second, CIGNA contends that Ms. Bynum failed to provide sufficient documentation to establish that Katrina's DOC Procedure was medically necessary.

### 1.

■ CIGNA maintains that its denial of Katrina's Claim was proper because the DOC Procedure was cosmetic. As explained *supra,* the term "cosmetic," as used in the Plan, is limited to procedures, products, or services that affect appearance only, or which are performed for a purely superficial benefit. Because Katrina's DOC Procedure was not utilized for the sole purpose of providing her with an aesthetically pleasing, symmetrical head shape, the treatment was not "cosmetic." Instead, her DOC Procedure constituted treatment for a congenital birth defect and its related symptoms, with the added hope that it might prevent the onset of serious abnormalities often associated with her birth defect, such as malocclusion of the mandible. Accordingly, CIGNA's determination that the DOC Procedure was "cosmetic" was objectively unreasonable and not supported by substantial evidence. *See Ellis v. Metro. Life Ins. Co.,* 126 F.3d 228, 234 (4th Cir.1997).

### 2.

 Nonetheless, CIGNA argues that, even if Katrina's DOC Procedure was not "cosmetic," it had no obligation to provide coverage for her treatment because the documentation submitted by Ms. Bynum failed to establish the medical necessity of the DOC Procedure. More specifically, CIGNA asserts that Katrina's DOC Procedure was not medically necessary because it was neither "[n]ecessary for" nor "[p]rovided for the ... treatment, cure or relief of a Medical Condition, illness, injury or disease," as required by the Plan.[16]

We cannot agree. The uncontradicted evidence shows that the "the DOC band, as used upon Katrina Bynum, was medically indicated," meaning that, in Katrina's circumstances, the DOC Procedure was treatment for the misshapen skull attributable to her birth defect. The documentation that Ms. Bynum submitted in support of Katrina's Claim further established the medical necessity of the DOC Procedure. For example, both of Katrina's treating physicians, a pediatrician and a pediatric neurosurgeon, opined that Katrina's asymmetrical head shape was a medical condition requiring treatment. And the uncontradicted medical evidence indicates that the appropriate treatment for Katrina's medical condition was the DOC Procedure.

In light of the uncontradicted medical evidence, CIGNA's contention that Katrina's DOC Procedure was not medically necessary fails to meet the two-pronged test of *Brogan,* i.e., it is neither "supported by substantial evidence" nor the result of "a deliberate, principled reasoning process." *Brogan v. Holland,* 105 F.3d 158, 161 (4th Cir.1997) (internal citations and quotations omitted). As such, CIGNA's denial of Katrina's Claim was not "objec-tively reasonable," and the Plan must provide coverage for Katrina's Claim.

### 3.

Finally, CIGNA's rejection of coverage for Katrina's Claim, whether based on the lack of medical necessity, or on its being an excluded "cosmetic" procedure, was not objectively reasonable, thereby constituting an abuse of discretion. As we have observed, an abuse of discretion occurs when a reviewing court possesses a "definite and firm conviction that ... a clear error of judgment" has occurred "upon weighing of the relevant factors." *Westberry v. Gislaved Gummi AB,* 178 F.3d 257, 261 (4th Cir.1999); *see also United States v. General,* 278 F.3d 389, 396 (4th Cir.2002) (observing abuse of discretion occurs when discretion exercised arbitrarily or capriciously, considering law and facts). In this instance, we are left with the definite and firm conviction that CIGNA committed a clear error of judgment, and it thereby abused its discretion.

### IV.

For the foregoing reasons, we affirm the decision of the district court that Katrina's Claim is covered under the Plan.

*AFFIRMED.*

---

**16.** The Plan defines a Medical Condition as "[a] disease, illness or injury."