640 S.E.2d 474

**Linda JAMES and David James, individually and as parents and natural guardians of Meredith James, a minor under the age of 14, Respondents,**

v.

**STATE OF SOUTH CAROLINA EMPLOYEE INSURANCE PROGRAM,[1] Appellant.**

**No. 4182.**

Court of Appeals of South Carolina.

Submitted Nov. 1, 2006.

Decided Nov. 27, 2006.

Rehearing Denied Jan. 30, 2007.

---

1. We note the defendant in this action was previously misnamed in the pleadings as Blue Cross Blue Shield of South Carolina; however, the circuit court, with the parties' consent, "ORDERED, ADJUDGED and DECREED, that the pleadings be amended to reflect that the State of

638

Theodore DuBose Willard, Jr., of Columbia, for Appellant.
John Magruder Read, IV, of Greenville, for Respondents.

GOOLSBY, J.:

This appeal arises from a dispute about health insurance coverage under a group plan for state employees and their dependents. David James, acting on behalf of himself and his wife, Linda (collectively, "the Jameses"), sought pre-authorization for a medical device for their infant daughter, Meredith. Blue Cross Blue Shield of South Carolina ("Blue Cross"),

South Carolina Employee Insurance Program [is] the [Defendant] in this action...." Accordingly, we have made this amendment in the caption for this appeal.

denied coverage on the basis the device, which is designed to treat a misshaped skull, was not medically necessary as it served only a cosmetic purpose. The Appeals Committee of the State of South Carolina Employee Insurance Program ("EIP"), upheld the denial of coverage. The circuit court reversed, finding the device was medically necessary and within the scope of the policy's coverage. We affirm the circuit court's ruling.[2]

## FACTS

David James was employed by the State of South Carolina, which, through EIP, has established a group health insurance plan ("State Health Plan") for state employees and their dependents. Blue Cross is responsible for processing the claims. At the time this action arose, James had coverage for himself and his dependents.

The Jameses' daughter, Meredith, was born on March 4, 2003. She was diagnosed with plagiocephaly when she was approximately ten and a half months old. According to exhibits included in the record, this term has been generally defined as follows:

> Plagiocephaly, which literally translates to "oblique head," is a term used to describe asymmetry of the head shape [ ] when viewed from the top. Late during fetal life, the head may become compressed unevenly in utero.... Such inequality of forces may result in asymmetric molding of the head and face.[3]

In addition to restrictive intrauterine positioning, plagiocephaly can develop from such causes as birth trauma, torticollis, and sleeping position.

---

2. We decide this case without oral argument pursuant to Rule 215, SCACR.

3. This definition appears in materials included in the record on "Torticollis and Related Issues" distributed by Dr. John M. Graham, Jr., of the Cedars–Sinai Medical Center, excerpted from *Smith's Recognizable Pattern of Human Deformation*, 3rd Edition, W.B. Saunders Publishing Company, Philadelphia, PA, 2002. *See also Taber's Cyclopedic Medical Dictionary* 1519 (17th ed. 1993) (defining plagiocephaly as "[m]alformation of the skull producing the appearance of a twisted and lopsided head").

Meredith was also diagnosed with a condition known as torticollis, or twisted neck syndrome, which refers to the posture that results from the head being tilted or twisted for a variety of reasons.[4] It has been further defined as follows:

Torticollis, or twisted neck, is a condition in which the sternocleidomastoid muscle is shortened or tightened on one side of the neck, causing the head to tilt toward the affected muscle and the head to turn away. This is the most frequent cause of deformational posterior plagiocephaly, which results from progressive occipital flattening when a baby with torticollis is preferentially placed in [a] supine position.[5]

To treat this condition, the Jameses sought pre-authorization from Blue Cross for a Dynamic Orthotic Cranioplasty Band, or DOC Band, for Meredith. A DOC Band is similar to a helmet and is used to correct the shape of an infant's head. Cranial Technologies, Inc., the supplier, described the device as follows in its documentation requesting pre-authorization approval for Meredith:

The DOC® Band is an FDA approved medical device for the treatment of deformational plagiocephaly. It is a non-invasive outpatient procedure used for correcting abnormal head shape in infants up to 18 months. The procedure involves making a plaster cast of the infant's head and custom creating a band which is worn 23 hours a day. The infant is monitored and the band is modified on a weekly or biweekly basis. Average treatment time is 2–4 months.

The DOC Band is a six-ounce device consisting of an outer plastic shell with a foam lining, and mild pressure is applied to inhibit growth in prominent areas and encourage growth in flat areas. The DOC Band is viable for about two to four months, and some children may require more than one band, depending on the age of the child and the severity of the

---

4. This definition appears in the article on "Torticollis and Related Issues" excerpted from *Smith's Recognizable Pattern of Human Deformation and* distributed by Dr. John M. Graham, Jr. of Cedars–Sinai Medical Center. *See also Taber's Cyclopedic Medical Dictionary* 2012 (17th ed. 1993) (discussing torticollis and its causes).

5. This information is from the article on "Torticollis and Related Issues."

deformity. A DOC Band costs approximately $3,000.00. The price is an all-inclusive fee that includes fabrication, adjustments to the DOC Band, and all patient visits.

Blue Cross denied coverage on the basis the treatment was purely for cosmetic purposes and was not medically necessary. The Jameses sought review by the Appeals Committee of EIP, which upheld the denial of coverage by letter of February 25, 2005 based on several provisions and exclusions in the State Health Plan. The first provision is found in Article 2 of the State Health Plan, entitled "DEFINITIONS," which defines medically necessary as follows:

**2.57 Medical Necessity; Medically Necessary or Necessary Service and Supply**

A service or supply that:

A. Is required to identify or treat an illness or injury; and

B. Is prescribed or ordered by a Physician, and

C. Is consistent with the Covered Person's illness, injury, or condition, and in accordance with proper medical and surgical practices prevailing in the medical specialty or field of medicine at the time rendered; and

D. Is required for reasons other than the convenience of the patient. The fact that a service is prescribed by a Physician does not necessarily mean that such service is Medically Necessary.

Additionally, the Appeals Committee of EIP relied on Article 9, entitled "EXCLUSIONS AND LIMITATIONS," which provides in relevant part as follows:

9.1 No benefits will be provided under any Article of this Plan for any service, supply or charges for the following:

A. Any service or charge for service which is not Medically Necessary as defined in paragraph 2.57; any service or charge for service which is performed in a more costly setting than that required by a Covered Person's condition, in which case benefits will be limited to the benefits due had the services been performed in the least costly setting required by the Covered Person's condition;

. . . .

J. Hospital and Physicians services and prescription drugs related to procedures or goods that have primarily cosmetic effects including but not limited to cosmetic surgery, or the complications resulting there from. *Cosmetic goods, proce-*

*dures or surgery shall mean all goods, procedures, and surgical procedures performed to improve appearance or to correct a deformity without restoring a bodily function. In the instances of the following and other procedures which might be considered "cosmetic"*—e.g., rhinoplasty (nose), mentoplasty (chin), rhytidoplasty (face lift), glabellar rhytidoplasty, surgical planing (dermabrasion), blepharoplasty (eyelid), mammoplasty (suspension or augmentation), superficial chemosurgery (acid peel of the face) and rhytidectomy (abdomen, legs, hips, or buttocks including lipectomy or adipectomy)—*benefits may only be provided when the malappearance or deformity was caused by physical trauma, surgery, or congenital anomaly* (as opposed to familial characteristics or aging phenomenon) occurring after the Covered Person's Effective Date of coverage under this Plan or a Predecessor Plan; provided, however, that surgery to correct a cleft palette, or for restoration required because of burn injuries, or other similar procedures performed in stages or after certain growth has been attained, are not excluded because the physical trauma, surgery or congenital anomaly (as opposed to familial characteristics or aging phenomenon), occurred after the Covered Person's Effective Date of Coverage under this Plan or a Predecessor Plan.... [Emphasis added.]

The Appeals Committee of EIP concluded the DOC Band claims for Meredith dated February 6, 2004 and July 2, 2004 fell within these contractual exclusions.[6] The Jameses appealed this determination to the circuit court, which reversed, finding the DOC Bands were medically necessary and within the scope of coverage. This appeal followed.

---

6. The Appeals Committee of EIP states in its report: "In summary, the Committee determined that there is no documentation of any neurologic or functional impairment associated with Meredith's condition. Instead, the use of both DOC Bands was only to improve appearance. Thus, no benefits are provided for Meredith's DOC Bands because the Plan of Benefits does not cover this service because it is not a medical necessity, any service or supply that is used to identify or treat an illness or injury and is not necessary to correct a functional deficit. Accordingly, Meredith's February 6, 2004 and July 2, 2004 Doc [B]and claims fall[] within specific contractual exclusions." The Jameses decided it was not in Meredith's best interest to wait for a response to their appeal, so they proceeded with the treatment. They had two bands made, at a total cost of approximately $6,000.00.

## STANDARD OF REVIEW

Section 1–11–710(C) of the South Carolina Code provides that "claims for benefits under any self-insured plan of insurance offered by the State to state and public school district employees and other eligible individuals must be resolved by procedures established by the board [South Carolina Budget and Control Board], which shall constitute the exclusive remedy for these claims, subject only to appellate judicial review consistent with the standards provided in Section 1–23–380." S.C.Code Ann. § 1–11–710(C) (2005).

After the exhaustion of administrative remedies, an appeal for review may be made to the circuit court, which sits in an appellate capacity. Under section 1–23–380(A)(6) of the Administrative Procedures Act ("APA"), a reviewing court may reverse the decision of an agency upon the grounds, among others, that the decision is "affected by [an] error of law" or is "clearly erroneous in view of the reliable, probative and substantial evidence on the whole record." S.C.Code Ann. § 1–23–380(A)(6)(d) & (e) (2005). In addition, the decision may be reversed where it is "arbitrary or capricious or characterized by [an] abuse of discretion or [a] clearly unwarranted exercise of discretion." *Id.* § 1–23–380(A)(6)(f).

## LAW/ANALYSIS

 On appeal, EIP contends the circuit court erred in finding the administrative agency's decision was clearly erroneous and not supported by substantial evidence. We disagree.

In finding the DOC Bands were medically necessary and within the scope of the State Health Plan's terms of coverage, the circuit court noted that Meredith's "treating neurosurgeon, Dr. John Johnson[,] stated unequivocally that the application of the DOC Bands were 'medically necessary' to correct her plagiocephaly." [7] The court additionally noted:

The record further reflects that the child's condition was characterized by deformity of the skull, face and jaw. The records from Dr. Johnson and notes from the Respondent's

---

7. The court stated Dr. Johnson was "the only physician who personally examined and treated the infant child" and observed that, in contrast,

own internal Nurse Review both set forth that the treatment prescribed was purposed to remedy in part, "musculoskeletal deformities of skull, face and jaw" of the infant. As set forth in the medical research contained within the record, malocclusion of the mandible or jaw is a functional abnormality often associated with this defect and the DOC [B]and is a remedy prescribed to prevent development of this condition where the jaw, face and skull are malformed.

In *Bynum v. Cigna Healthcare of North Carolina, Inc.*, 287 F.3d 305 (4th Cir.2002), the United States Court of Appeals, Fourth Circuit, upheld an order of the United States District Court for the District of South Carolina requiring coverage for a DOC Band to correct an infant's skull deformity. *Id.* at 315. The Fourth Circuit rejected the insurer's assertion that the DOC Band served only a cosmetic function and was not medically necessary and was, therefore, outside the scope of coverage in a claim governed by the Employee Retirement Income Security Act ("ERISA"). *Id.* at 314.

The child in question, Katrina Bynum, was diagnosed with plagiocephaly directly related to congenital torticollis, which her treating pediatrician stated "is a medical condition[,] not a cosmetic condition." *Id.* at 310. Katrina had flattening on the right side of her head, her right ear was closer to the face than her left ear, and the right side of her head protruded outward greater than the left side. *Id.* at 309–10 & 310 n. 8. The Fourth Circuit found Katrina's DOC Band was not cosmetic as it "was not utilized for the sole purpose of providing her with an aesthetically pleasing, symmetrical head shape. . . ." *Id.* at 314. "Instead, her DOC Procedure constituted treatment for a congenital birth defect and its related symptoms, with the added hope that it might prevent the onset of serious abnormalities associated with her birth defect, such as malocclusion of the mandible." *Id.* The court concluded the insurer's determination that the DOC Band was purely cosmetic "was objectively unreasonable and not supported by substantial evidence." *Id.*

the evidence submitted by EIP to deny coverage consisted of the opinions of non-treating physicians from other states who never examined the child. The peer review physicians engaged by Blue Cross reviewed portions of Meredith's medical records, but they did not personally examine her prior to making their recommendations to deny coverage.

The court also rejected the argument that the DOC Band was not covered because it was not medically necessary since it was not necessary "for the ... treatment, cure or relief of a Medical Condition, illness, injury or disease" as defined by the health plan. *Id.* at 315. The court noted that "both of Katrina's treating physicians, a pediatrician and a pediatric neurosurgeon, opined that Katrina's asymmetrical head shape was a medical condition requiring treatment. And the uncontradicted medical evidence indicates that the appropriate treatment for Katrina's medical condition was the DOC Procedure." *Id.* at 315.

The court further concluded that the insurer's rejection of coverage, whether being based on the lack of medical necessity or on its being excluded as a cosmetic procedure, was not objectively reasonable and constituted an abuse of discretion. *Id.* The court stated that it was "left with the definite and firm conviction that [the insurer] committed a clear error of judgment, and it thereby abused its discretion" in this case.[8] *Id.*

We find this reasoning persuasive in the instant appeal and conclude its application is warranted here. Article 9, paragraph J of the State Health Plan policy excludes coverage for procedures or goods that have primarily cosmetic effects, which it defines as follows: "Cosmetic goods, procedures or surgery shall mean all goods, procedures, and surgical procedures performed to improve appearance or to correct a deformity without restoring a bodily function." Even where

---

8. The Fourth Circuit observed in *Bynum* that the insurer "possessed a financial self-interest in defining 'cosmetic' in a broad manner," as counsel for the insurer had acknowledged the company was "presently facing an increasing number of benefit claims for DOC Procedures, because the number of infants with asymmetrical skulls is increasing due to current trends in post-natal positioning." *Id.* at 312. The court noted that parents were being advised to place infants on their backs to avoid Sudden Infant Death Syndrome ("SIDS"). *Id.* at 312 n. 15. It has also been noted in the medical literature submitted for the current appeal that there has been an increased rate of plagiocephaly with the 1992 recommendation of the American Academy of Pediatrics to use back positioning as a way to reduce the incidence of SIDS. Although the SIDS rate has declined approximately forty percent since that recommendation, the incidence of positional plagiocephaly has increased. *See, e.g.,* Persing, James, Swanson & Kattwinkel, "Prevention and Management of Positional Skull Deformities in Infants," *American Academy of Pediatrics Clinical Report,* p. 199, Vol. 112, No. 1, July 2003.

items are arguably cosmetic, however, benefits "may ... be provided when the malappearance or deformity was caused by physical trauma, surgery, or congenital anomaly...."

Before Meredith was two months old, the Jameses noticed her eyes and ears did not look symmetrical. One of her ears was a little smaller than the other and her eyes appeared to be of dissimilar size. Her pediatrician at the time, Dr. Raymond Flanders, told them it could be the orbital bones that made the eyes appear different.

Meredith was ultimately diagnosed at ten and one-half months with plagiocephaly and torticollis. At that point Meredith was seen by Dr. John Johnson, a neurosurgeon with the Southeastern Neurological and Spine Institute, who found Meredith had positional plagiocephaly. Dr. Johnson wrote a prescription for a cranial molding device, the DOC Band, on February 2, 2004.

Dr. Johnson, as Meredith's treating neurosurgeon, stated in a letter dated February 2, 2004, that Meredith was "found to have a form of positional cranial deformity known as plagiocephaly. This particular deformity may be corrected by the use of a cranial helm[e]t. This device is used to [reshape] the distorted head shape of an infant so that hopefully surgery is avoided. I strongly feel that this device is medically necessary for the treatment of this child." [9]

As noted by the circuit court, "the only physician who personally examined and treated the infant child stated unequivocally that the treatment was medically necessary." Even the peer review analysis conducted at the request of Blue Cross noted that the DOC Band had improved not only "the shape of the patient's head" but also "the degree of torticollis" (twisted neck syndrome). Cranial Technologies, the company producing the DOC Band, opined that use of the DOC Band "results in normal to near normal head shape. If left untreated, the infant can have persistent facial asymme-

9. Dr. David Matthews, of the Department of Plastic Surgery, Head–Shape Screening Clinic, Cranial Technologies, completed a letter of June 3, 2004, along with an Initial History and Initial Physical of the same date, stating Meredith's abnormal head shape was noticed when Meredith was approximately one month old and that Meredith had positional plagiocephaly and torticollis. Dr. Matthews recommended a second DOC Band to continue the treatment being administered by Dr. Johnson.

try, which can affect mandibular mechanics, jaw function, airway and orbital alignment. For this reason, the DOC Band is deemed a medical necessity."

The Jameses point out that the American Medical Association ("AMA") has issued Resolution 119 (I–97), which states the AMA is aware that "[i]nsurance companies ... are increasingly denying insurance coverage for treatment of children's deformities, disfigurement and congenital defects, claiming that these services are non-functional and thus considered 'cosmetic' in nature and therefore declared a non-covered disorder." *See* "Coverage of Children's Deformities, Disfigurement and Congenital Defects," *American Medical Association,* Resolution 119 (I–97) <www.ama-assn.org; www.cappskids.org/res119.pdf>. Resolution 119 affirmatively declares, however, the AMA's position is that correction of these facial anomalies is not cosmetic because it is performed on abnormal structures to restore them to a more normal state; further, correction is generally to improve function, although it may also be done to approximate a normal appearance. *Id.* The AMA stated "[c]hildren who do not have birth defects and facial anomalies repaired face long-term physical and psychological injuries." *Id.* The AMA noted at least twelve states had passed legislation requiring insurance coverage for children's deformities or craniofacial surgery. *Id.*

The AMA has also issued AMA Policy H–185.967, which declares "that treatment of a minor child's congenital or developmental deformity or disorder due to trauma or malignant disease should be covered by all insurers" and "shall include treatment which, in the opinion of the treating physician, is medically necessary to return the patient to a more normal appearance...." *See* "Coverage of Children's Deformities, Disfigurement and Congenital Defects," *American Medical Association,* AMA Policy H–185.967 <www.ama-assn.org/ad-com/polfind/hlth-ethics.pdf>.

 We find EIP's assertion that coverage should be denied based on its averment that Meredith did not *currently* have severe mandible or other problems requiring surgery to be unpersuasive. The position of the treating physician was that treatment would prevent the development of these problems and obviate the need for surgery. In our view, it would not be reasonable to require a patient to delay medically-

recognized, viable treatments until a problem becomes more severe before coverage applies.

Further, we agree with the circuit court that, considering the record as a whole, reasonable minds would conclude treatment in this case is not primarily cosmetic, but rather, it does affect the functioning of the patient and it is medically necessary. *Cf. Baggott v. S. Music, Inc.*, 330 S.C. 1, 5–6, 496 S.E.2d 852, 854–55 (1998) (finding substantial evidence is evidence which, considering the record as a whole, would allow reasonable minds to reach the agency's conclusion; the supreme court held substantial evidence did not support the agency's determination to deny coverage because reasonable minds would conclude the claimant's injury did arise out of and in the scope of his employment).

Accordingly, we affirm the order of the circuit court finding the Jameses' claim for insurance benefits relating to the DOC Band procedures should be approved.

**AFFIRMED.**

STILWELL and SHORT, JJ., concur.