PUBLISHED

# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

VERDELLE BLACKSHEAR,
                    *Plaintiff-Appellant,*

v.

RELIANCE STANDARD LIFE INSURANCE
COMPANY, a Delphi Financial
Company,

                    *Defendant-Appellee.*

No. 06-2126

Appeal from the United States District Court
for the Eastern District of North Carolina, at Raleigh.
James C. Fox, Senior District Judge.
(7:05-cv-00064-F)

Argued: September 26, 2007

Decided: December 7, 2007

Before NIEMEYER and TRAXLER, Circuit Judges, and
Samuel G. WILSON, United States District Judge for the
Western District of Virginia, sitting by designation.

---

Reversed by published opinion. Judge Traxler wrote the opinion, in
which Judge Niemeyer and Judge Wilson joined.

---

## COUNSEL

**ARGUED:** Jeffrey Stephen Miller, Jacksonville, North Carolina, for
Appellant. Joshua Bachrach, RAWLE & HENDERSON, Philadel-
phia, Pennsylvania, for Appellee.

**OPINION**

TRAXLER, Circuit Judge:

Verdelle Blackshear appeals a decision of the district court awarding summary judgment to Reliance Standard Life Insurance Company ("Reliance Standard") and refusing to disturb the denial of Blackshear's claim for benefits under a group life insurance policy. For the reasons that follow, we reverse.

I.

Reliance Standard issued a group life insurance policy to Duplin General Hospital that became effective on January 1, 2003. The group policy, which was part of Duplin General's employee welfare benefit plan, covered both present and future hospital employees. The policy set forth the following benefits schedule:

SCHEDULE OF BENEFITS

NAMES OF SUBSIDIARIES, DIVISIONS OR AFFILIATES TO BE COVERED: None

ELIGIBLE CLASSES: Each active, full-time employee, except any person employed on a temporary or seasonal basis.

WAITING PERIOD:

Present Employees - Exempt*: none
       Non-exempt*: none

Future Employees - Exempt*: 180 days
       Non-exempt*: none

* as defined by the Fair Labor Standards Act, as amended.[1]

---

[1]The Fair Labor Standards Act of 1938 imposes minimum wage and maximum hour requirements. *See generally* 29 U.S.C.A. §§ 201-219 (West 1998 & Supp. 2007). Certain types of employees are exempt from these provisions. *See* 29 U.S.C.A. § 213. The parties agree that the decedent in this case was a "non-exempt" employee.

INDIVIDUAL EFFECTIVE DATE: The first of the Policy month coinciding with or next following completion of the Waiting Period, if applicable.

J.A. 19. The statutorily required Summary Plan Description ("SPD") issued to the employees included an identical schedule of benefits. *See* 29 U.S.C.A. § 1022 (West 1999), § 1024(b) (West 1999 & Supp. 2007).

On June 10, 2003, Verdie Blackshear ("Verdie") began working at Duplin General as a nurse and received a copy of the SPD for Duplin General's employee welfare benefit plan. Verdie died six months later on December 14, 2003. Blackshear, Verdie's named beneficiary under the policy, filed a claim on January 8, 2004, with Reliance Standard for the life insurance proceeds of $81,078.40. According to the language of both the SPD and the policy itself, non-exempt employees such as Verdie hired after the issuance of the Policy were not subject to a service waiting period, meaning that the coverage provided by the policy took effect immediately upon Verdie's employment.

Upon receiving the claim, Reliance Standard contacted the Human Resources Department for Duplin General to verify Verdie's non-exempt status and the effective date of her coverage. In a letter dated January 21, 2004, Susan Hayes, Duplin General's Vice President for Human Resources, wrote that, contrary to the actual language of the policy and the SPD, the "policy should cover all employees for life insurance after six (6) months of employment" and that "[t]here should be no discrimination between exempt and non-exempt employees." J.A. 167. On January 26, 2004, Reliance Standard reissued Duplin General's group policy. The amended policy, which had the same January 1, 2003, effective date, eliminated the distinction between exempt and non-exempt employees and instead imposed a six-month service waiting period for all employees before coverage would take effect. The Individual Effective Date remained the same: "The first of the Policy month coinciding with or next following *completion of the Waiting Period*." J.A. 276 (emphasis added).

Reliance then denied Blackshear's claim on the grounds that Verdie was not insured under Duplin General's group policy on Decem-

ber 12, 2003, the date of her death, for failure to satisfy the waiting period as defined in the *amended* policy:

> Verdie Blackshear was employed June 10, 2003. . . . [T]he applicable 6 month Waiting Period of Full-time employment would have been satisfied on December 10, 2003. The scheduled effective date of insurance for Ms. Blackshear was January 1, 2004. . . .
>
> As Verdie Blackshear died prior to the scheduled effective date of her coverage, January 1, 2004, she did not satisfy the eligibility requirements . . . and the life insurance coverage did not go into effect in accordance with the terms of the policy . . .
>
> We are aware that due to a clerical error, booklets were printed that did not correctly state the applicable 6 month waiting period of employment. [Duplin General] confirmed in [a] telephone conversation [on] March 5, 2004 and in earlier conversations with our staff that all eligible employees of Duplin General Hospital are subject to the 6 month Waiting Period of Full-Time employment and that the original booklets contained an error regarding application of the Waiting Period for non-exempt employees. This error has now been corrected and new booklets have been forwarded to [Duplin General] for distribution to . . . eligible employees.

J.A. 109.

Blackshear sought review of the denial of her claim for benefits under Reliance Standard's appeal review procedure. Reliance Standard concluded that its original determination to deny benefits was proper and denied Blackshear's appeal. In affirming its denial of benefits, Reliance Standard acknowledged that "an error had occurred in the initial Policy and booklet printing with regard to the applicable 'WAITING PERIOD,'" and classified the omission of the waiting period for non-exempt employees in the original policy and SPD as a "clerical error" that was inconsistent with "the original intention of the Policy." J.A. 93. In addition to its conclusion that "original inten-

tion" prevails over unambiguous language in the policy and the SPD, Reliance Standard also relied upon the "General Provisions" section of the policy that provides "[c]lerical errors in connection with the Policy or delays in keeping records for the Policy, whether by you, us, or the Plan Administrator . . . (1) will not terminate insurance that would otherwise have been effective; and (2) will not continue insurance that would otherwise have ceased or should not have been in effect." J.A. 93.

Ultimately, Blackshear filed this action against Reliance Standard under ERISA, seeking review of the denial of benefits. *See* 29 U.S.C.A. § 1132(a)(1)(B) (West 1999). The parties filed cross-motions for summary judgment. Applying a modified abuse of discretion standard of review, *see Bynum v. Cigna Healthcare of North Carolina, Inc.*, 287 F.3d 305, 311 (4th Cir. 2002), the district court determined that Reliance Standard did not abuse its discretion in applying the "clerical errors" provision of the policy and that substantial evidence supported its conclusion that, "'but for the clerical error,' Verdie Blackshear's coverage under the life insurance policy could not have gone into effect until January 1, 2004." J.A. 330. Accordingly, the district court entered summary judgment in favor of Reliance Standard.

On appeal, Blackshear argues that the clear and unambiguous language originally set forth in the SPD and the policy controls and afforded Verdie insurance coverage immediately upon employment without a waiting period. Reliance Standard's disregard of this unambiguous language, contends Blackshear, amounted to an abuse of discretion.

## II.

In reviewing the denial of benefits under an ERISA plan, a court's first task is to consider *de novo* whether the relevant plan documents confer discretionary authority on the plan administrator to make a benefits-eligibility determination. *See Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989); *Johannssen v. District No. 1-Pacific Coast Dist., MEBA Pen. Plan*, 292 F.3d 159, 168 (4th Cir. 2002). "When a plan by its terms confers discretion on the plan's administrator to interpret its provisions and the administrator acts reasonably

within the scope of that discretion, courts defer to the administrator's interpretation." *Colucci v. Agfa Corp. Severance Pay Plan*, 431 F.3d 170, 176 (4th Cir. 2005), *cert. denied*, 126 S. Ct. 2300 (2006). In this case, the policy provided as follows: "Reliance Standard Life Insurance Company shall serve as the claims review fiduciary with respect to the insurance policy and the Plan. The claims review fiduciary has the discretionary authority to interpret the Plan and the insurance policy and to determine eligibility for benefits." J.A. 263. The parties agree that the plan confers discretionary authority upon Reliance Standard, as the plan administrator, to make benefit decisions according to the terms of the plan. *Cf. Stup v. Unum Life Ins. Co. of Am.*, 390 F.3d 301, 307 (4th Cir. 2004) (applying abuse of discretion review where ERISA plan afforded the administrator "the discretionary authority both to determine an employee's eligibility for benefits and to construe the terms of this policy") (internal quotation marks omitted). Under the abuse of discretion standard, the reviewing court will not disturb the plan administrator's decision as long as it was reasonable. *See Firestone*, 489 U.S. at 111; *Booth v. Wal-Mart Stores, Inc.*, 201 F.3d 335, 342 (4th Cir. 2000).

Typically, once it has determined that the abuse of discretion standard applies, the reviewing court turns to the question of whether the administrator's exercise of discretion was reasonable as determined by the application of a number of well-established factors. *See Booth*, 201 F.3d at 342-43; *Colucci*, 431 F.3d at 176. However, when the plan administrator's own business interests will be affected directly by its decision on the claim for benefits, a conflict of interest arises that "may operate to reduce the deference given to a discretionary decision of that fiduciary . . . to the extent necessary to neutralize any untoward influence resulting from that conflict." *Booth*, 201 F.3d at 343 n.2. (internal quotation marks omitted). In effect, we use a "sliding-scale standard of review" when a genuine conflict exists: "'[t]he more incentive for the administrator . . . to benefit itself by a certain interpretation of benefit eligibility . . ., the more objectively reasonable the administrator['s] . . . decision must be and the more substantial the evidence must be to support it.'" *Stup*, 390 F.3d at 307 (quoting *Ellis v. Metro. Life Ins. Co.*, 126 F.3d 228, 233 (4th Cir. 1997)).

Because Reliance Standard insures the very plan it administers, the district court concluded that it was operating under a conflict of inter-

est. Reliance Standard does not challenge the district court's application of the modified abuse of discretion standard under the circumstances, and we agree that this standard of review was appropriate for judicial review of decisions in which Reliance Standard was *actually exercising* its discretionary authority under the plan. *See Bynum*, 287 F.3d at 312-13.

With these principles in mind, we turn to the substantive issues.

### III.

Broadly speaking, "ERISA plans are contractual documents which, while regulated, are governed by established principles of contract and trust law." *Haley v. Paul Revere Life Ins. Co.*, 77 F.3d 84, 88 (4th Cir. 1996). Accordingly, courts must enforce and follow "the plan's plain language in its ordinary sense." *Bynum*, 287 F.3d at 313 (internal quotation marks omitted). Moreover, "even as an ERISA plan confers discretion on its administrator to interpret the plan, the administrator is not free to alter the terms of the plan or to construe unambiguous terms other than as written." *Colucci*, 431 F.3d at 176. To the extent the administrator enjoys discretion to interpret the terms of a plan in the course of making a benefits-eligibility determination, such interpretive discretion applies *only to ambiguities* in the plan. *See id.* ("Interpretive discretion only allows an administrator to resolve ambiguity."); *Kress v. Food Employers Labor Relations Ass'n*, 391 F.3d 563, 567 (4th Cir. 2004) (explaining that "discretionary authority is not implicated" where "the terms of the plan itself are clear"). An administrator's discretion never includes the authority "to read out unambiguous provisions" contained in an ERISA plan, and to do so constitutes an abuse of discretion. *Colucci*, 431 F.3d at 176; *see id.* ("[F]or instance, if a plan unambiguously provides 20 weeks of compensation as a severance benefit for an employee who has worked for the company for 10 years, the administrator abuses its discretion by reading the plan to provide 17 weeks of compensation.").

It is undisputed that, at the time of Verdie's death, the plan documents relevant to Duplin General's group life insurance clearly and unequivocally afforded coverage for Verdie and other non-exempt employees without a waiting period. Thus, in concluding that, contrary to the written instruments, Verdie was in fact subject to a 180-

day waiting period, Reliance Standard was not resolving an ambiguity in the policy's language but reading a clear and unambiguous provision out of the written plan documents.

Nevertheless, Reliance Standard contends that we should not disturb its decision to deny benefits for two reasons. First, Reliance Standard asserts that the failure to include a service waiting period in the original policy was a "clerical error" and that the policy permitted it unilaterally to amend or correct "clerical errors" in the terms of the policy. Second, Reliance Standard argues that the omission of a waiting period was the result of a scrivener's error and that the doctrine of equitable reformation permits the policy to be corrected retroactively to reflect the actual intent of the contracting parties. We conclude that the denial of benefits cannot stand under either theory.

A.

According to Reliance Standard, the "clerical errors" provision set forth in the group policy permitted it to make its benefits-eligibility determination based on extrinsic evidence of the contracting parties' original intent instead of the written terms of the policy. After receiving Blackshear's claim and reviewing correspondence between Duplin General and Reliance Standard before the original policy was issued, Reliance Standard amended the policy to include a service waiting period for all employees and then relied upon the amended version of the policy to deny Blackshear's claim for benefits. Thus, we must decide whether it was permissible for Reliance Standard to deny Blackshear's claim based on a retroactive amendment to the policy.

The group policy is part of an "employee welfare benefit plan," *see* 29 U.S.C.A. § 1002(1) (West 1999), which is "exempt from the statutory vesting requirements that ERISA imposes on pension benefits." *Wheeler v. Dynamic Eng'g, Inc.*, 62 F.3d 634, 637 (4th Cir. 1995). Generally speaking, "a plan participant's interest in welfare benefits is not automatically vested," and an employer sponsoring the plan may therefore unilaterally "terminat[e] or modify[ ] previously offered benefits that are not vested." *Gable v. Sweetheart Cup Co.*, 35 F.3d 851, 855 (4th Cir. 1994); *see Wheeler*, 62 F.3d at 637 ("[A]n

employer may amend the terms of a welfare benefit plan or terminate it entirely.").

Nevertheless, the terms of a plan may create vested rights in welfare benefits even though the employer is under no obligation to do so. *See Wheeler*, 62 F.3d at 638. "An employer or plan sponsor may unilaterally modify or terminate welfare benefits, unless it contractually agrees to grant vested benefits." *Chiles v. Ceridian Corp.*, 95 F.3d 1505, 1510 (10th Cir. 1996). Once an employer or plan sponsor grants vested rights under a welfare benefit plan, however, it may not retroactively amend the plan to deprive a beneficiary of a vested benefit. *See Wheeler*, 62 F.3d at 638, 640. In *Wheeler*, this court rejected an attempt to amend a group medical insurance policy to eliminate coverage retroactively for a specific course of treatment that the beneficiary had already begun. *See id.* at 640. We concluded that the beneficiary's rights under a welfare benefit plan providing medical insurance vested at the moment the triggering event under the policy occurred and that the plan could not be amended to deny coverage after that point. *See id.* at 638-40. Numerous courts have taken, in a wide array of circumstances, a similarly dim view of any amendment that attempts to retroactively eliminate vested welfare benefit rights. *See Member Servs. Life Ins. Co. v. American Nat'l Bank & Trust Co. of Sapulpa*, 130 F.3d 950, 954-57 (10th Cir. 1997); *Filipowicz v. American Stores Benefit Plans Comm.*, 56 F.3d 807, 815 (7th Cir. 1995); *Bartlett v. Martin Marietta Operations Support, Inc. Life Ins. Plan*, 38 F.3d 514, 517 (10th Cir. 1994); *Wulf v. Quantum Chem. Corp.*, 26 F.3d 1368, 1377-78 (6th Cir. 1994); *Confer v. Custom Eng'g Co.*, 952 F.2d 41, 43 (3d Cir. 1991) (per curiam).

Accordingly, we must determine whether Blackshear's right to life insurance proceeds vested before Reliance Standard issued the amended policy. In *Wheeler*, we referred to general state insurance law in concluding that under a group medical insurance policy, benefits vest at the time that the covered loss occurs. *See* 62 F.3d at 638 ("[U]nder a medical insurance policy or plan . . . insur[ing] against illness, coverage for all medical costs arising from a particular illness vests when the illness occurs."). Under "general principles of insurance contract law . . . such benefits do vest when performance is due under the contract. At that point, the contract is no longer executory and must be performed in accordance with the terms then in exis-

tence." *Member Servs.*, 130 F.3d at 956. In the case of a group life insurance policy, the right to benefits vests — *i.e.*, performance becomes due — at the time of the plan participant's death. *See Filipowicz*, 56 F.3d at 815; *Adams v. Jefferson-Pilot Life Ins. Co.*, 558 S.E.2d 504, 507 (N.C. App. 2002); *see generally* 4 Lee R. Russ & Thomas F. Segalla, *Couch on Insurance* § 58:16 (3d ed.) ("[T]he rights of the named beneficiary vest at the instant of the insured's death, and cannot be affected by any subsequent act of the insurer."). Here, Blackshear's rights under the plan vested at the moment Verdie died, which was prior to the issuance of the amended policy containing a service waiting period. The insertion of a waiting period had the effect of dispossessing Blackshear of rights that were already vested and was therefore impermissible.

In rejecting the denial of benefits based on a post-death amendment to a group life insurance policy, the Seventh Circuit explained that the employer could not

> retroactively modify a life insurance policy after the insured's death so as to take away the life insurance proceeds due a beneficiary at the date of the insured's death . . . [A]t [the insured's] death [the beneficiary] became entitled to the . . . insurance proceeds, not based on ERISA's vesting principles, but based on general insurance law which provides that a beneficiary's right to insurance proceeds vests on the date of the insured's death. . . . A later modification, even one which is retroactive, can have no effect on a beneficiary's claim to benefits.

*Filipowicz*, 56 F.3d at 815. We agree with this reasoning and conclude that Reliance Standard may not rely on its amended policy to deny benefits to Blackshear.

We also conclude that the "clerical errors" provision does not dictate a different result. This provision provided that "[c]lerical errors in connection with the Policy or delays in keeping records for the Policy, whether by you, us, or the Plan Administrator . . . will not continue insurance that would otherwise have ceased or should not have been in effect." J.A. 93. Reliance Standard argues that the failure to include a waiting period in the original policy was a "clerical error"

upon which Blackshear cannot rely to "continue insurance that . . . should not have been in effect." Assuming such an omission would even qualify as a "clerical error," and assuming that this provision relates in some way to the sponsor's general right to amend or eliminate the policy at anytime (which it does not), we believe the language still in no way authorizes the administrator to divest benefits that are already due by amending, modifying or correcting the language of the policy itself.

In sum, Reliance Standard may not deprive Blackshear of vested benefits based on the waiting period in the amended policy. We conclude that its application of the "clerical errors" provision to arrive at such a result was an abuse of discretion.

### B.

Having concluded that Reliance Standard may not deny life insurance benefits to Blackshear by amending the policy, we turn to the question of whether it can achieve the same result via the equitable doctrine of reformation.

Reliance Standard argues that regardless of what the plan dictates, the omission of the waiting period resulted from a scrivener's error and that the policy should be enforced according to the true intent of the contracting parties. In denying benefits, Reliance Standard indeed based its decision on its view of the intent of the contracting parties to apply a service waiting period before coverage became effective for individual employees. We conclude that Reliance Standard had no authority to reform the policy in this manner and that, in any event, equitable reformation is not appropriate under these circumstances.

The doctrine of equitable reformation permits a court to exercise its equitable powers to reform a contract to correct a mutual mistake of fact or a scrivener's error that fails to capture the true intent of the contracting parties. "In contract law, a scrivener's error, like a mutual mistake, occurs when the intention of the parties is identical at the time of the transaction but the written agreement does not express that intention because of that error; this permits a court acting in equity to reform an agreement." 27 Richard A. Lord, *Williston on Contracts* § 70:93 (4th ed.). The party seeking reformation of the contract must

present evidence that is "clear, precise, convincing and of the most satisfactory character that a mistake has occurred and that the mistake does not reflect the intent of the parties." *International Union v. Murata Erie N. Am., Inc.*, 980 F.2d 889, 907 (3d Cir. 1992) (internal quotation marks omitted).

The salient point for our purposes, however, is that reformation, whether it is based upon scrivener's error or mutual mistake, is most decidedly a remedy available *in a court of equity*. "The purpose of proving a mistake is to correct what has become an erroneous situation. Equity will act to bring an erroneous writing into conformity with the true agreement . . . A mistake, in and of itself, has no legal effect." 27 *Williston on Contracts* § 70:17. The doctrine of equitable reformation does not apply in the context of an administrator's interpretation of an ERISA plan; the administrator cannot simply "reform" a plan to correct what it unilaterally perceives to be a mistake or error contained in the plan's written terms. Rather, reformation, like other forms of equitable relief, must be requested by the party seeking to reform the contract and granted by a court. *See Audio Fid. Corp. v. Pension Benefit Guar. Corp.*, 624 F.2d 513, 518 (4th Cir. 1980 (noting that "a court of equity can reform a contract to correct a mistake disclosed by oral proof" if "the mistake [is] mutual, or . . . [is] accompanied by fraud on the part of [one] contracting party"); *see also Nechis v. Oxford Health Plans, Inc.*, 421 F.3d 96, 103 (2d Cir. 2005); *Cinelli v. Security Pac. Corp.*, 61 F.3d 1437, 1444-45 (9th Cir. 1995); *International Union*, 980 F.3d at 907-08. Accordingly, to the extent Reliance Standard ignored the unambiguous written terms of the plan and denied benefits based on extrinsic evidence of the "true intent" of the contracting parties, Reliance Standard acted outside of the scope of its discretion.

We also reject Reliance Standard's suggestion that the district court in fact applied the doctrine of equitable reformation. In no sense did the district court reform the group policy. The district court saw the issue as "whether Reliance Standard abused its discretion in its application of the 'clerical error' provisions of the Policy." J.A. 330. The district court's focus, therefore, was on Reliance Standard's application of a specific provision contained in the plan; to the extent the court considered and discussed evidence of Duplin General's original request that the group policy include a waiting period, it did so to

determine whether there was substantial evidence in the record to support application of the "clerical error" provision. Of course, the district court's omission of any discussion of the doctrine of equitable reformation is not surprising in view of Reliance Standard's failure to request or refer to such relief in its pleadings or its legal memoranda submitted with the cross-motions for summary judgment.

Even though Reliance Standard did not afford the district court an opportunity to pass on this issue below, we need not return the case for the district court to address the propriety of equitable reformation. We conclude that, under the circumstances of this case, it would be inappropriate for the court to exercise its equitable powers to reform the policy. To do so would undercut important fundamental aims of ERISA. For example, reforming the policy to deprive Blackshear of benefits that are due based on extrinsic documents would foster uncertainty about employee benefits rather than furthering ERISA's goal of "ensur[ing] that an employee's rights and obligations can be readily ascertained from the plan documents." *Cinelli*, 61 F.3d at 1445. A paramount goal of ERISA "is to enable plan beneficiaries to learn their rights and obligations at any time." *Curtiss-Wright Corp. v. Schoonejongen*, 514 U.S. 73, 83 (1995). Thus, ERISA favors "reliance on the face of *written* plan documents" so that "every employee may, *on examining the plan documents*, determine exactly what his rights and obligations are under the plan." *Id.* (first emphasis added).

The fundamental requirement that plan participants have sufficient notice of their rights under an ERISA plan drove our decisions in *Pierce v. Security Trust Life Insurance Co.*, 979 F.2d 23 (4th Cir. 1992) (per curiam), and *Aiken v. Policy Management Systems Corp.*, 13 F.3d 138 (4th Cir. 1993) (per curiam), which hold that, if there is a conflict between the Summary Plan Description (SPD) and the actual language of the Plan as to the terms of the plan, the SPD controls. This is so even if the policy language, not the SPD, reflects the actual intent of the contracting parties. Indeed, we reasoned that the SPD should prevail essentially because it is the "employee's primary source of information regarding employment benefits." *Pierce*, 979 F.2d at 27 (internal quotation marks omitted). Post-hoc reformation of the policy here would run contrary to the principles underlying *Pierce* and *Aiken*, particularly since the SPD does not contradict or conflict with the language of the Duplin General group policy. In this

case, the SPD and the plan itself agree; there is utterly no indication of an error or mistake. This case is unlike one where a clerical or scrivener's error would be apparent.

Finally, equitable reformation in the circumstances of this case is inappropriate in view of ERISA's protection of vested rights. Pension benefit plans create benefits that vest according to statute and are non-forfeitable. *See Nachman Corp. v. Pension Benefit Guar. Corp.*, 446 U.S. 359, 374-75 (1980). Although benefits under a welfare benefit plan do not statutorily vest, if the plan creates vested rights, then the employer or sponsor is not free simply to strip away such rights uni-laterally. *See Wheeler*, 62 F.3d at 638. In our view, equitable reforma-tion would cut the legs out from under *Wheeler* and permit Reliance Standard to make an end run around *Wheeler*'s prohibition against divesting benefits in these circumstances.

Accordingly, we conclude that equitable reformation is not appro-priate.

## IV.

For the foregoing reasons, we reverse the decision of the district court and remand for judgment to be entered in favor of Blackshear.

*REVERSED*