UNPUBLISHED

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 07-1063

JANET R. GORSKI,

                    Plaintiff - Appellant,

          v.

ITT LONG TERM DISABILITY PLAN FOR SALARIED EMPLOYEES;
METROPOLITAN LIFE INSURANCE COMPANY,

                    Defendants - Appellees.

Appeal from the United States District Court for the Eastern
District of North Carolina, at Greenville.  James C. Dever III,
District Judge.  (7:05-cv-00150-D)

Argued:  September 24, 2008          Decided:  November 3, 2008

Before MICHAEL and TRAXLER, Circuit Judges, and Richard L.
VOORHEES, United States District Judge for the Western District
of North Carolina, sitting by designation.

Reversed and remanded by unpublished per curiam opinion.  Judge
Traxler wrote an opinion concurring in part and dissenting in
part.

**ARGUED:** Andrew O. Whiteman, HARTZELL & WHITEMAN, L.L.P.,
Raleigh, North Carolina, for Appellant.  Theresa Jeszeck Baker,
METLIFE, Long Island City, New York, for Appellees.  **ON BRIEF:**
Stephen A. Dunn, EMANUEL & DUNN, P.L.L.C., Raleigh, North
Carolina, for Appellees.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Janet R. Gorski appeals a district court order denying her motion for summary judgment and granting summary judgment against her in her action against the ITT Long Term Disability ("LTD") Plan for Salaried Employees ("the Plan") and Metropolitan Life Insurance Company ("MetLife"), alleging wrongful termination of her LTD benefits. We reverse and remand to the district court with instructions to reinstate Gorski's benefit award and consider her claims for prejudgment interest and an award of attorney's fees and costs.

I.

Gorski worked as a secretary at ITT Automotive in Auburn Hills, Michigan, until February 1998. While at ITT, she participated in the Plan, which provides LTD benefits. MetLife insures the Plan and serves as claims administrator with "discretionary authority to interpret the terms of the Plan and to determine eligibility for and entitlement to Plan benefits in accordance with the terms of the Plan." J.A. 500. To qualify for LTD benefits, participants must be "Totally Disabled," which the Plan defines as follows:

> 1) During the six-month qualifying period plus the first 12 months in which you receive LTD benefits, you are considered Totally Disabled if you are unable to perform the regular duties of your occupation while

> under the continuous and appropriate care of a licensed physician and you are not employed elsewhere.
>
> 2) After the first 12 months in which you receive LTD benefits, Total Disability means you are unable to engage in any and every duty pertaining to any occupation or employment for wage or profit for which you are qualified, or become reasonably qualified by training, education or experience.

J.A. 490. In order to continue to receive LTD benefits under the Plan, participants must regularly submit proof of continued disability.

In October 1997, Gorski received treatment from Dr. Young Seo for "severe lower back pain" that she reported as resulting from lifting her leg as she tried to put on her pants. J.A. 79. She claims this injury was a reaggravation of a previous injury that happened in early 1977 when she fell outside of ITT. Dr. Seo diagnosed Gorski as having L5 nerve root irritation, a bulging disc, and inflammation of the joint between L4 and L5, and he treated her with spinal injections. Gorski missed approximately one month of work, then returned to work for approximately nine weeks before suffering a recurrence of her symptoms on February 6, 1998. An MRI dated that day showed two herniated discs. As a result, she received special injections, pain medication, and physical therapy. She did not return to work again.

Gorski applied for LTD benefits on August 11, 1998. Dr. George R. Shell, a neurosurgeon, stated in an Attending

4

Physician Statement ("APS") that Gorski had two herniated discs and was scheduled for "lumbar cage fusion" surgery on August 18, 1998, which would render her "unable to perform any type of work for at least 6 months." J.A. 133-34. Shortly thereafter, MetLife approved Gorski's claim, as of August 11, 1998.

Nearly two months after the surgery, Gorski informed MetLife that she was experiencing "[n]umb feet, legs & low back nerve spasms [with] shooting pain down both legs" and that she could not lift more than two pounds, sit for more than 30 minutes, or walk for a very long time without "excessive pain" in her legs and lower back. J.A. 136. Dr. Schell reported that Gorski had been doing very well until December 1998, when during a bout with vomiting, she "felt something pop in her back" and began having pain in her right leg and back. J.A. 310. On March 19, 1999, Dr. Schell noted that Gorski "still seems quite symptomatic." J.A. 177. In that regard, Gorski reported that although her legs were feeling better, she had burning pain in her hips when she walked and discomfort when she sat as well. Gorski underwent an MRI examination on June 22, 1999.

Meanwhile, Dr. Schell had provided MetLife in May 1999 with his office notes, discharge records relating to the August 1998 surgery, and radiological reports. This prompted MetLife, on July 27, 1999, to approve a continuance of Gorski's LTD benefits on the basis that she was unable to perform any occupation for

which she was qualified. Dr. Schell treated Gorski with epidural injections and physical therapy until she moved to North Carolina in December 1999.

In September 1999, MetLife arranged for an independent medical examination of Gorski by Dr. Robert S. Levine, an orthopedic surgeon. After examining Gorski and reviewing her medical records, Dr. Levine diagnosed "status post laminectomy and anterior fusion (cages) for ruptured disc" and "chronic pain syndrome with significant depression." J.A. 212. He recommended that Gorski receive treatment at a multidisciplinary pain center offering pain management, that she participate in a functional reactivation program, and that she receive psychological therapy. He determined that Gorski should be capable of performing sedentary activities that involve no bending and do not require her to lift more than five pounds. He believed that she could have a functional capacities evaluation and noted that he "felt that there are significant ongoing psychological factors which would interfere with her ability to perform and to return to gainful employment." J.A. 212. Responding to Dr. Levine's opinion, Dr. Schell informed MetLife that while he did not reject Dr. Levine's treatment recommendations, he believed that Gorski might also need further surgery sometime in the future.

When Gorski subsequently moved to North Carolina, she began receiving treatment from Dr. George Huffmon, a neurosurgeon. On June 15, 2000, Gorski underwent a CT scan, flexion/extension scan, and bone scan. Reviewing the results, Dr. Huffmon concluded that Gorski's "4/5 right cage is kicked out laterally" and seemed to be compressing at least one nerve root and possibly two. J.A. 348. He recommended physical therapy and surgery to have "pedicle screws from 4 to S1 and attempt to get the cage out if we can't clamp it down and put it back in position." J.A. 348. He noted, though, that Gorski was "very reluctant" to undergo another surgery. J.A. 347. After examining Gorski again on December 28, 2000, Dr. Huffmon concluded that her pain was still preventing her from returning to work. He sent her for a second opinion regarding possible surgery to Dr. Mark Rodger, who determined that she was not a good candidate for surgery and turned her care over to a primary care physician and pain management specialist.

On May 25, 2001, MetLife asked Gorski for additional information concerning her treatment. Gorski wrote that she suffered from "spas[]ming in [her] low[er] back, shooting pain into [her] right leg, [a] numb right foot, [and] stinging pain in [her] toes." J.A. 259. She also reported that her right leg was weak, she could not lift it very much, and that it would give out, causing her to fall if she did not have someone or

7

something to support her.  She noted that, since her surgery, she had been depressed and suffered irritable bowel syndrome, increased occurrences of dizziness, and urinary incontinence. She also wrote that no accommodation would allow her to return to work because she could not "even clean [her] house or lift groceries" and that even "holding a full gallon of milk is a chore."  J.A. 261.  She stated that she "ha[s] to lay down in a fetal position to take the pressure off . . . when [she] stand[s] for 20-25 min[utes,] sometimes even less."  J.A. 261. She stated that she could not "believe how everything has a tie to [her] lower back."  J.A. 261 (emphasis in original).

As part of its ongoing review, MetLife also conducted videotape surveillance of Gorski.  MetLife's investigator filmed Gorski on August 28, 2001, leaving her home, driving to a grocery store, and shopping with another female and child without visible medical aides or devices, before driving home. Gorski's gait appeared normal, and she did not appear to be in pain.  On October 9, 2001, he observed her watering plants in her front yard, which included her carrying gallon jugs of water in each hand and bending at the knees and at the waist to pour water from the jugs, again without any apparent pain or difficulty.

MetLife also reviewed an APS from Dr. Huffmon, dated August 2, 2001, diagnosing "L4-5 radiculopathy, post laminectomy

8

syndrome" and again indicating his view that treatment should include "fusion [with] pedicle screws." J.A. 268. Dr. Huffmon concluded that Gorski was "[u]nimproved" and disabled for any occupation. J.A. 269. He listed restrictions for all activities except grasping, handling, finger dexterity, and concentrated visual attention.

Dr. William J. Faircloth also completed an APS form in January 2002. Like Dr. Huffmon, he concluded that Gorski's nerve root compression, resulting in lower back pain, right leg pain, and numbness, rendered her disabled for any occupation. He noted that even her sitting ability was limited.

On April 16, 2002, MetLife sought clarification from Dr. Faircloth regarding his conclusion that Gorski's ability to sit was limited, asking in particular whether Gorski could "sit for 45 minutes, break, and resume sitting for another 45 minutes, through[]out an 8 hour work day" and, if she could not, to specify her sitting capability. J.A. 408. Dr. Faircloth responded that he was unable to make that determination. When MetLife asked for clarification, Dr. Faircloth's office responded that he could not answer the questions because he had not seen Gorski often enough. At his most recent examination of her, on February 13, 2002, he had noted that she was exercising regularly and had no new or specific complaints.

9

MetLife subsequently informed Gorski, via a letter dated June 4, 2002, that it was terminating her benefits as of that date since she was no longer disabled within the meaning of the Plan. The letter referenced Dr. Faircloth's inability to determine the extent of her sitting limitations, the fact that she was regularly exercising on February 13, 2002, and the investigator's surveillance report. It also noted her vocational history, including her associate degree in business administration and her strong background in administrative, secretarial, and bookkeeping jobs. Considering the skills needed to be an administrative assistant and that the job is "sedentary and require[s] lifting, carrying, pushing and pulling of [only] 10 pounds occasionally," J.A. 288, MetLife concluded that Gorski could perform her prior job. The letter recommended that if Gorski appealed the decision, she should provide recent physical exam findings, recent diagnostic testing results, her current treatment plan and response, restrictions and limitations preventing her from working, her prognosis for when she could return to work, and any other information or documentation that would support a finding of disability.

Gorski appealed her benefits termination on September 19, 2002, submitting additional medical records, including, among other things, office notes of an outpatient consultation in July 2000 with neurosurgeon Thomas Melin, who noted that "the L4/5

10

cage on the right appears to be somewhat laterally displaced and posteriorly displaced." J.A. 306. On December 4, 2002, Gorski sent MetLife a note from Dr. Huffmon stating that Gorski "can sit for 45 minutes and take a 10 minute break to lay down [and] then resume sitting for up to 4 hours a day—there is No Job this woman can perform." J.A. 408 (emphasis in original). Gorski also sent MetLife notes from Dr. Richard Leighton regarding his examination of her on August 8, 2002. He wrote that "[m]anual motor strength testing showed some weakness of the plantar flexors and dorsiflexors on the right which are 4/5. She has point tenderness over the trochanteric bursa on the left but has reasonable fluid ROM." J.A. 409. He also reported that x-rays showed "a bit of posterior displacement of one of the cages." J.A. 409. He noted, concerning her history, that she had "numbness, weakness, prior fractures, back pain, ringing in her ears, blood in her stool, lumps, balance problems, depression, sleep disorder, and easy bruising." J.A. 411. He added that Gorski walks with a cane and has "[p]ain [that] comes and goes." J.A. 411. He described her as "[w]alk[ing] with an antalgic gait and slightly off balance." J.A. 411.

MetLife subsequently referred Gorski's file on December 23, 2002, to Network Medical Review for an independent physician consultation review. Dr. M. Marc Soriano reported conducting a "thorough review" of the medical records MetLife had provided

11

him. J.A. 426. He specifically discussed the September 13, 1999, examination performed by Dr. Levine and the notes from Dr. Leighton's August 8, 2002, examination, stating about them that Gorski's "subjective complaints have remained significant despite the fact that the objective exams are unremarkable." J.A. 426. Dr. Soriano concluded that Gorski's "examinations are all replete with subjective complaints but no significant objective findings . . . that would support an impairment," J.A. 426, and that Dr. Huffmon's opinion that Gorski could sit for only 45 minutes an hour for four hours per day was "not substantiated in the clinical documentation," J.A. 427. Dr. Soriano determined from his review that Gorski could sit, stand, or walk continuously for one hour and could sit, stand, and walk for all eight hours of an eight-hour period. In light of Gorski's prior surgery and her continuing complaints of pain, Dr. Soriano concluded that Gorski "should be limited to sedentary to light duty positions." J.A. 427. He finally stated that "Gorski's complaints remain only subjective and are disproportionate to any objective findings on x-rays or physical exam findings." J.A. 427. Dr. Soriano's report made no mention of the dislodged surgical hardware that several of the other doctors concluded was irritating her surrounding nerve tissue and causing her to suffer significant pain in her lower back and right leg.

12

MetLife sent Gorski's attorney a letter dated January 20, 2003, stating that it had denied Gorski's appeal.  The letter, relying on the Plan, Gorski's job description, the limitations that Dr. Huffmon and Dr. Faircloth had identified, and Dr. Soriano's report, concluded that "the medical documentation in [MetLife's] file does not support a disability, as defined in the plan."  J.A. 421.

Gorski then initiated the current action in federal court on August 12, 2005, under 29 U.S.C.A. § 1132(a)(1)(B) (West 1999) of the Employee Retirement Income Security Act of 1974 ("ERISA"), for wrongful denial of benefits.  She requested LTD benefits from June 4, 2002 to the judgment date, prejudgment interest, a determination that she is entitled to continue to receive benefits for as long as she remains eligible, and attorney's fees and costs.

Considering cross-motions for summary judgment, the district court denied Gorski's motion and granted MetLife's motion.  The court applied a modified abuse-of-discretion standard of review to MetLife's decision in light of MetLife's status as both the insurer of LTD benefits and the fiduciary with discretionary authority to determine benefits eligibility. The court concluded that despite the conclusions of Drs. Huffmon and Faircloth that Gorski could not return to work, MetLife's decision to uphold its benefits denial was reasonable as a

13

matter of law. The court pointed out that Dr. Faircloth could not say that Gorski could not work throughout an eight-hour day, sitting 45 minutes at an interval with breaks in between, and that Dr. Huffmon did not explain his view that Gorski could sit only in 45-minute increments for a total of four hours. The court also recognized that although Gorski's doctors identified objective evidence indicating Gorski would suffer chronic lower back pain, in the end, their opinions that she could not do her old job depended on the veracity of Gorski's self-reported limitations. The court noted that independent physician consultant Dr. Levine concluded that Gorski could engage in sedentary activities following pain management therapy, and that Dr. Soriano concurred in that assessment. The district court finally added that the video surveillance reasonably could be viewed as further evidence that Gorski's limitations were not as great as Drs. Huffmon and Faircloth believed.

## II.

### A.

We review the grant of summary judgment de novo, viewing all of the facts in the light most favorable to the nonmovant. See EEOC v. Navy Fed. Credit Union, 424 F.3d 397, 405 (4th Cir. 2005). Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file,

14

together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); see Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).

In reviewing the denial of benefits under an ERISA plan, a district court's first task is to consider de novo whether the relevant plan documents confer discretionary authority on the plan administrator to make a benefits-eligibility determination. See Johannssen v. District No. 1-Pacific Coast Dist., MEBA Pen. Plan, 292 F.3d 159, 168 (4th Cir. 2002). "When a plan by its terms confers discretion on the plan's administrator to interpret its provisions and the administrator acts reasonably within the scope of that discretion, courts defer to the administrator's interpretation." Colucci v. Agfa Corp. Severance Pay Plan, 431 F.3d 170, 176 (4th Cir. 2005). The parties agree that the Plan confers discretionary authority upon MetLife, as the plan administrator, to make benefit decisions according to the terms of the plan. Under the abuse-of-discretion standard, the reviewing court will not disturb the plan administrator's decision as long as it was reasonable. Such a decision is reasonable "if it is the result of a deliberate, principled reasoning process and if it is supported by substantial evidence," Stup v. UNUM Life Ins. Co. of Am., 390

15

F.3d 301, 307 (4th Cir. 2004) (internal quotation marks omitted), which is "evidence which a reasoning mind would accept as sufficient to support a particular conclusion," LeFebre v. Westinghouse Elec. Corp., 747 F.2d 197, 208 (4th Cir. 1984) (internal quotation marks omitted).

However, when the plan administrator's own business interests will be directly affected by its decision regarding the benefits claim, a conflict of interest arises that "may operate to reduce the deference given to a discretionary decision of that fiduciary to the extent necessary to neutralize any untoward influence resulting from that conflict." Blackshear v. Reliance Standard Life Ins. Co., 509 F.3d 634, 639 (4th Cir. 2007) (internal quotation marks & alteration omitted). In effect, we use a "sliding-scale standard of review" when a genuine conflict exists: "'[t]he more incentive for the administrator . . . to benefit itself by a certain interpretation of benefit eligibility . . ., the more objectively reasonable the administrator['s] . . . decision must be and the more substantial the evidence must be to support it.'" Stup, 390 F.3d at 307 (quoting Ellis v. Metro. Life Ins. Co., 126 F.3d 228, 233 (4th Cir. 1997)); see also Metro. Life Ins. Co. v. Glenn, 128 S. Ct. 2343, 2350 (2008) (explaining that when plan administrator both evaluates benefits claims and pays those claims, the resulting conflict of interest "should be

16

weighed as a factor in determining whether there is an abuse of discretion" (internal quotation marks omitted)).

Because MetLife insures the very plan it administers, the district court concluded that MetLife was operating under a conflict of interest. MetLife does not challenge the district court's application of the modified abuse-of-discretion standard under the circumstances, and we agree that this standard of review was appropriate. See Stup, 390 F.3d at 307.

B.

With these principles in mind, we turn to the substantive questions. The issue decided by MetLife and litigated before the district court was whether Gorski could "perform the sedentary duties of an administrative assistant." J.A. 513. Resolution of this question became dependent on the legitimacy and extent of Gorski's back pain. In this regard, Gorski has produced evidence clearly demonstrating that dislodged surgical hardware was irritating nerve tissue surrounding the hardware, causing her substantial pain and other problems as well. On that point, Gorski produced the report of Dr. Huffmon that a CT scan and flexion and extension films showed that her 4/5 cage was "kicked out laterally," apparently "compressing her right 4 nerve root and maybe even catching her right 5 nerve root as well," resulting in "[l]ow back pain and right leg pain." J.A.

17

348. Gorski presented an APS from Dr. Faircloth essentially agreeing with Dr. Huffmon's assessment. Dr. Leighton further noted that Gorski's x-rays showed "a bit of posterior displacement of one of the cages." J.A. 409. Drs. Huffmon and Faircloth both concluded that Gorski was disabled from any occupation, and Dr. Faircloth specifically opined that Gorski "can sit for 45 minutes and take a 10 minute break to lay down [and] then resume sitting for up to 4 hours a day." J.A. 408. Gorski herself represented that no accommodation could allow her to return to the workplace in light of the severity of her lower back pain. Thus, Gorski clearly satisfied her initial burden of producing substantial evidence that she was disabled from performing any job.

In nonetheless upholding its termination of Gorski's disability benefits, MetLife noted that Gorski's job description for her previous job as sales secretary required her "to sit for 3-4 hours, stand, walk, and climb for 1-2 hours per work shift." J.A. 420. The job also "required some repetitive use of the hands and the use of the neck and head" but only "occasional lifting or carrying up to 10 lbs." J.A. 420. MetLife concluded that while Drs. Faircloth and Huffmon opined that Gorski could not perform any job, the specific limitations that the doctors identified regarding her functionality did not preclude her working in her prior job as an administrative assistant.

18

MetLife also relied on Dr. Soriano's conclusions that "Gorski did not have any impairment based upon objective findings," that she could perform sedentary work, and that Dr. Huffmon's sitting restrictions of 45 minutes on, followed by 10-minute breaks, for up to 45 minutes were not supported by Gorski's recent physical examinations. J.A. 421.

Gorski argues that MetLife acted unreasonably in basing its final decision to terminate her benefits on Dr. Soriano's opinion. MetLife does not deny that it relied on Dr. Soriano's opinion, but maintains that its reliance was reasonable. We agree with Gorski.

The crux of Dr. Soriano's opinion is that there are no objective findings to support Gorski's complaints of pain and that Gorski exaggerates the level of pain. Indeed, as noted, Dr. Soriano went so far as to say that Gorski "does not have any impairment based upon objective findings." J.A. 426 (emphasis added); see J.A. 427 ("[S]he has no obvious objective impairment").

The problem with Dr. Soriano's opinion is that Dr. Soriano never explained on what basis he doubted the veracity of Gorski, whom he had never examined. To the extent that he did not believe that Gorski's physical problems would cause the intense pain of which she complained, he never revealed why he rejected the view of the other doctors that dislodged surgical hardware

19

was irritating surrounding nerve tissue, resulting in debilitating pain for Gorski. In fact, he never discussed at all the June 2000 CT scan and flexion and extension films that several doctors reported as depicting the dislodged hardware and resulting nerve root impingement and as supporting Gorski's claims regarding the extent of her pain. Without such a discussion, Dr. Soriano's report is simply an unreasoned and unexplained rejection of the objective evidence in the record, Gorski's claims regarding her level of pain and functionality, and the opinions of Drs. Huffmon and Faircloth that she was totally disabled. MetLife was not justified in rejecting the opinions of Drs. Faircloth and Hoffman as well as Gorski's statements on the basis of such a flawed report. See Stup, 390 F.3d at 308 ("[W]hile an administrator does not necessarily abuse its discretion by resolving an evidentiary conflict to its advantage, the conflicting evidence on which the administrator relies in denying coverage must be 'substantial'--especially when . . . the administrator has an economic incentive to deny benefits."). Thus, it cannot be said that MetLife's decision was "the result of a deliberate, principled reasoning process." Id. at 307; see Black & Decker Disability Plan v. Nord, 538 U.S. 822, 834 (2003) ("Plan administrators . . . may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician."); Buffonge v. Prudential Ins.

20

Co. of Am., 426 F.3d 20, 30-31 (1st Cir. 2005) (holding that denial was not "reasoned" when it relied in part on fundamentally flawed medical reports).

MetLife contends that it acted reasonably in upholding its termination of Gorski's benefits because the record contains conflicting evidence concerning whether she could perform her job as an administrative assistant. In this regard, MetLife argues that the functional limitations reported by Drs. Huffmon and Faircloth would not prevent Gorski from undertaking many of the duties of a secretary, and MetLife notes that Dr. Levine had also concluded that Gorski should be capable of doing some sedentary activities. MetLife further argues that Dr. Huffmon did not provide any explanation for his asserted sitting limitations for Gorski or even indicate that he had examined her in the several months preceding his assertion. Finally, MetLife points to the video surveillance as a basis for discrediting Gorski's claimed pain and limitations, on which the other doctors' opinions of her limitations were based.

We conclude that MetLife's "substantial evidence" argument misses the mark. Importantly, the defect in MetLife's final decision was not that the evidence before it was insufficient to support a hypothetical decision to deny benefits, but rather, that the actual decision that MetLife issued was not reasoned and principled. See id. (holding that insufficiently reasoned

21

decision denying benefits would be overturned regardless of whether substantial evidence could have supported a reasoned decision denying benefits).  And, because we cannot conclude with any certainty that MetLife would have reached the same decision had it completed an appropriate analysis of Dr. Soriano's report and the assumptions underlying his conclusions, the decision terminating Gorski's benefits must be overturned. See id. at 31 (suggesting that plan administrator's reliance on faulty evidence might be ignored if other evidence before the administrator "compelled or virtually compelled" the administrator to deny the claim).

C.

Having determined that MetLife's decision constituted an abuse of discretion, we now turn to the question of the appropriate remedy.  "[T]he administration of benefit and pension plans should be the function of the designated fiduciaries, not the federal courts." Bernstein v. CapitalCare, Inc., 70 F.3d 783, 788 (4th Cir. 1995).  Therefore, it is generally the case that when a plan administrator's decision is overturned, a remand for a new determination is appropriate. See Flinders v. Workforce Stabilization Plan of Phillips Petroleum Co., 491 F.3d 1180, 1194 (10th Cir. 2007) (explaining that "[i]f the plan administrator failed to make adequate

22

factual findings or failed to adequately explain the grounds for the decision, then the proper remedy is to remand the case for further findings or additional explanation"); cf. Sheppard & Enoch Pratt Hosp., Inc. v. Travelers Ins. Co., 32 F.3d 120, 125 (4th Cir. 1994) (noting that remand is appropriate if the court concludes that the administrator lacked adequate evidence to make a decision); Berry v. Ciba-Geigy Corp., 761 F.2d 1003, 1007 (4th Cir. 1985) (same). However, "if the evidence in the record clearly shows that the claimant is entitled to benefits, an order awarding such benefits is appropriate." Flinders, 491 F.3d at 1194.

Here, a remand to MetLife for a new determination is not necessary because the record reflects that Gorski was clearly entitled to continued benefits. Although Dr. Levine opined in late 1999 that Gorski should be capable of performing sedentary activities that involve no bending and do not require her to lift more than five pounds, both Dr. Huffmon and Dr. Faircloth, in August 2001 and January 2002, respectively, opined that Gorski was disabled for any occupation. Because Dr. Soriano's analysis was incomplete, there simply was no basis by which MetLife could have discredited Dr. Huffmon's and Dr. Faircloth's medical opinions. The videotape surveillance was not sufficient in this regard. The fact that it showed Gorski bending, carrying water jugs, driving, and walking for a relatively short

23

time with no apparent discomfort does not cast significant doubt on the opinions of her physicians that she was not physically able to work for a sustained period of time. We therefore conclude that the only reasonable decision available to MetLife was to reverse its earlier decision discontinuing Gorski's benefits.

## III.

In sum, we reverse the order of the district court granting summary judgment to MetLife and denying Gorski's summary judgment motion, and we remand to the district court with instructions to reinstate Gorski's benefit award and consider her claims for prejudgment interest and an award of attorney's fees and costs.

REVERSED AND REMANDED

TRAXLER, Circuit Judge, concurring in part and dissenting in part:

I agree with the majority's decision reversing the district court's order granting MetLife's summary judgment motion and denying Gorski's motion, and I concur in Parts IIA and IIB of the majority opinion. However, because I believe that the district court should remand the matter to MetLife for a new benefits determination, I respectfully dissent from the majority decision to the extent that it orders reinstatement of Gorski's benefits.

A remand to MetLife is appropriate in my view because MetLife could have reasonably denied Gorski's appeal even without relying on Dr. Soriano's opinion. The requirements for Gorski's prior job, as described by MetLife in its letter denying her appeal, called for Gorski to sit for only three to four hours per shift. Even accepting as correct Dr. Huffmon's opinion that Gorski can sit for only 45 minutes before taking a 10-minute break from sitting, for up to four hours per day, it is not clear that that limitation would prevent her from meeting the job's requirements. Moreover, as the district court noted, Dr. Huffmon did not explain how he arrived at that limitation, nor did he even state that he had performed a recent examination on which his opinion was based.

MetLife could reasonably have deemed the lack of any explicit connection between Dr. Huffmon's asserted sitting limitation and Gorski's then-current physical condition to be particularly important in light of MetLife's specific request for "[r]ecent physical exam findings," J.A. 288, and in light of several indications that Gorski's symptoms may have either improved in the last year or perhaps been exaggerated in the first place. Those indications include Gorski's February 13, 2002, statement to Dr. Faircloth that she was exercising regularly and had no new or specific complaints, the notes from Dr. Leighton's August 8, 2002, exam not indicating any severe current symptoms, and the video surveillance of Gorski in October 2001 showing her carrying gallon water jugs, bending over, walking around, all with no apparent hesitation or discomfort. In light of all of these factors, I believe it was certainly reasonable for MetLife to require Gorski to present proof of her then-current physical condition, and it would have been reasonable for MetLife to determine that she had failed to do that to its satisfaction.

I would therefore reverse the order of the district court granting summary judgment to MetLife and denying Gorski's summary judgment motion, and I would remand to the district court with instructions to remand to MetLife for a new benefits

26

determination.  I respectfully dissent from the majority opinion to the extent that it reaches a contrary result.